UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| JAIME LUERA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:12-CV-316 |
| | § | |
| CONVERGYS CUSTOMER | § | |
| MANAGEMENT GROUP, INC., | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING IN PART DEFENDANT'S MOTION TO STRIKE AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     Factual and Procedural Background

Now before the Court are the Motion for Summary Judgment (Dkt. No. 19) and Motion

to Strike (Dkt. No. 25) filed by Defendant Convergys Customer Management Group, Inc.,

incorrectly named as Convergys Corporation.  Plaintiff Jaime Luera originally filed suit against

Defendant, his former employer, in County Court at Law No. 4, Hidalgo County, Texas, on

August 2, 2012.  (Dkt. No. 1, Exh. C).[1]  Defendant properly removed the case to this Court on

September 6, 2012 on the grounds that the Court has diversity jurisdiction over the action.  (Dkt.

No. 1; *see also* Dkt. No. 8).  Plaintiff's Original Petition, the live pleading in the case, alleges

that Plaintiff was "known to have a disability," and that after he "informed his supervisors of

medical care that was needed to treat this disability," he was subjected to "unfair and unequal

employment policies and conduct" and eventually terminated.  (Dkt. No. 1, Exh. C at ¶ 3).  On

these factual bases, Plaintiff brings causes of action under the Texas Commission on Human

Rights   Act   ("TCHRA")   for   disability   discrimination,   retaliation,   and   "reasonable

---

[1]  Plaintiff also sued his former supervisor, Amy Garcia, who has since been dismissed by this Court as
improperly joined.  *See* (Dkt. No. 1-4, Exh. C; Dkt. No. 8).

accommodation." *Id.* at ¶ 5.[2]  Defendant now moves for summary judgment on all of these claims, and also asks that the Court strike the affidavits of Plaintiff and his wife offered in response to the Motion for Summary Judgment.  (Dkt. Nos. 19, 25).  The Court finds, for the reasons explained *infra*, that it must strike only those relevant statements in Plaintiff's affidavit that either contradict his prior deposition testimony or are not based on his personal knowledge, and that it need not consider the affidavit of Plaintiff's wife in resolving Defendant's request for summary judgment.  Upon consideration of the Motion for Summary Judgment, the parties' responsive briefing, and the evidence, including the statements in Plaintiff's affidavit that survive Defendant's challenge, the Court finds that summary judgment must be granted for the following reasons.

## II.    Summary Judgment Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c).  Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing

---

[2]  Plaintiff originally brought an additional cause of action for "wrongful termination."  (Dkt. No. 1, Exh. C at ¶ 6).  In its July 15, 2013 Order addressing Defendant's first Motion for Summary Judgment, the Court determined that this claim was barred by the six-month limitations provision in Plaintiff's employment application, and entered summary judgment in Defendant's favor on this claim.  (Dkt. No. 17).

the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## III.    Overview of Summary Judgment Evidence

### A.    Defendant's Motion to Strike

The Court's consideration of the summary judgment evidence requires a preliminary assessment of the merits of Defendant's Motion to Strike certain evidence offered by Plaintiff: his affidavit and that of his wife, Christina Isabel Paz Luera. (Dkt. No. 25); *see* (Dkt. No. 23, Exhs. 1, 2). Mrs. Luera's affidavit contains statements that are either irrelevant to material fact issues or that relate to Defendant's request for summary judgment on its affirmative defense that Plaintiff has failed to mitigate his damages. *See* (Dkt. No. 19; Dkt. No. 23, Exh. 2). Since the Court finds that Plaintiff's TCHRA claims must be dismissed on other grounds, it need not consider the mitigation defense or any evidence pertaining to it. To this extent, Defendant's Motion to Strike is moot.[3]

---

[3]   The Motion to Strike is also moot with respect to those statements in Plaintiff's affidavit that are irrelevant or that relate only to the mitigation defense.

Plaintiff's affidavit, as Defendant points out, post-dates his deposition and in some ways contradicts that testimony.  (Dkt. No. 25; *see* Dkt. No. 19, Exh. A; Dkt. No. 23, Exh. 1).  Further, certain statements are not based on Plaintiff's personal knowledge, and are merely speculative.  To this extent, and when relevant to a material fact question, the Court will grant Defendant's Motion to Strike.  *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (Fifth Circuit "does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony."); FED.R.CIV.P. 56(c)(4) (affidavit used to oppose motion for summary judgment must be made on personal knowledge and set out facts that would be admissible in evidence).  The Court's ensuing discussion of the evidence and its analysis of Defendant's Motion for Summary Judgment will attempt to explain which of Plaintiff's statements relevant to the determination of that Motion must be disregarded, and which may be considered.

**B.     Plaintiff's Hiring, Promotions, and Employment Duties**

Defendant operates a call center in Pharr, Texas.  (Dkt. No. 19, Exh. B at ¶ 4).  In or around April 2009, Defendant hired Plaintiff as an "agent" responsible for taking phone calls and resolving customer issues.  (Dkt. No. 19, Exh. A at p. 15).  Plaintiff's immediate supervisor, Amy Garcia, promoted him to a trainer position in or around September 2009.  *Id.* at pp. 19-20, 25.  Plaintiff worked as a Program Ready Trainer ("PRT") for about one year before Garcia promoted him to Associate Trainer, the position he held at the time of his termination.  *Id.* at p. 21.  The duties of a PRT and Associate Trainer were essentially the same, although the latter was a salaried and more senior position.  *Id.* at p. 22, 87.

"In the 2010 to 2011 timeframe," Plaintiff was assigned to the DirecTV project handled by Defendant's call center in Pharr.  (Dkt. No. 19, Exh. B at ¶ 4).  For this project, Defendant

normally provided two training classes to its new employees.  *Id.* at ¶ 6.  The first, "Advancing

the Customer's Experience," was provided at the time of hiring and lasted two to three weeks.

*Id.*  New employees then would be placed with trainers on the call center floor to obtain "real

world" experience with customer calls.  *Id.*  Following this "on-the-floor" training, employees

would receive the second "Customer Relation Group" training class for two to three weeks.  *Id.*

As a PRT and then Associate Trainer, Plaintiff would facilitate this training.  *See id.*  The classes

required Plaintiff to train employees for seven to eight hours per day, with weekends off.  (Dkt.

No. 19, Exh. A at p. 23).

### C.    Plaintiff's First Leave of Absence and Requested Accommodations for Returning to Work

Plaintiff testified in his deposition that in late 2010, his stress levels at work increased

due to the following: (1) he felt that Garcia and/or Employee Relations Manager, Joe Miller, did

not support Plaintiff's efforts to enforce Defendant's policies with respect to two of his trainees

caught cheating, and another who was falling asleep in class; and (2) on one occasion, he

received "extremely negative" comments about his work performance.  *Id.* at pp. 31-34.

Additional evidence reveals that the alleged comments were made by training facilitator

Catherine Brodniak during a training of Plaintiff and others for a new client, and consisted of her

opinion that Plaintiff appeared unprepared and "scatterbrained" during his presentation.  (Dkt.

No. 19, Exh. C at ¶ 5; Dkt. No. 28, Exh. 1 at 000664).  Plaintiff notified Garcia of these

comments and their negative effect on him in an email dated November 10, 2010, with the

subject line, "Incident report."  (Dkt. No. 28, Exh. 1 at 000664).  Plaintiff's email stated his

"understanding" that Garcia "will want to make an effort that this will not happen again," but

asked her to "please keep this incident on a need to know basis" since he did not want to be

known or remembered as scatterbrained.  *Id.*  Plaintiff states in his affidavit that Brodniak's

comments "turned his world upside down," and that since his "condition" was worsening at that time, he believed that he needed to take a break from work. (Dkt. No. 23, Exh. 1 at ¶ 5).

In December 2010, Plaintiff visited a doctor and was diagnosed with major depression. (Dkt. No. 19, Exh. A at pp. 34, 67). Plaintiff became eligible for leave under the Family Medical Leave Act ("FMLA") after he submitted his "medical certification" from the doctor indicating that he needed time off from work. *See id.* at p. 39. During his FMLA leave, which lasted from December 2010 through April 2011, Plaintiff had conversations with Garcia about his diagnosis and when and how he could transition back to work. *See id.* at pp. 39-42. Since Defendant had switched to a new software called "Rover" during Plaintiff's absence, Plaintiff claims that he requested from Garcia that he be allowed to receive Rover training when he returned. *Id.* at pp. 43-44. According to Plaintiff, Garcia agreed to his request to attend two, three-week classes for a total of six weeks of training. *Id.* at pp. 44-46.[4] Although Plaintiff claims that this was "the normal training for when an employee comes back," he has identified no other employee who received six weeks of training upon returning from leave. *Id.* at pp. 44, 50. The declarations of Miller and his "boss," Senior Employee Relations Manager Camille Lilly, state that they are unaware of any trainer ever being provided six weeks of "acclimation" training after returning from a leave of absence. (Dkt. No. 19, Exh. B at ¶ 9; *see also id.* at pp. 65-66).

Plaintiff claims that in addition to asking Garcia for the six weeks of training, he requested that she give him two days' notice before changing his schedule so that he could adjust his medication accordingly. (Dkt. No. 19, Exh. A at p. 44).

---

[4] Plaintiff's affidavit implies that Garcia at first rejected his request on the basis that DirecTV had no "pay code" to compensate Defendant for Plaintiff's training, and that Miller overrode Garcia's paycode-based decision by approving the accommodation of two training classes. (Dkt. No. 23, Exh. 1 at ¶ 13). These statements contradict Plaintiff's prior testimony that Garcia agreed to the training, and that Miller did not help him with his accommodation requests, discussed *infra*.

**D.    Plaintiff's Return to Work**

**1.    "Acclimation" Training Provided**

Plaintiff returned to work on April 21, 2011 as an Associate Trainer at the same rate of pay, and with a doctor's release indicating that he had no restrictions. *Id.* at pp. 43, 89. Plaintiff testified that "[t]he doctor wrote this with the understanding that I was to receive…two classes of accommodation" upon return. *Id.* at p. 71. After receiving two days of Rover training, Plaintiff was told by Garcia that "business needs have changed" and that she needed him to take over a "full-time" class. *Id.* at pp. 44, 46. Garcia did not explain what the "business needs" were. *Id.* at p. 47. According to evidence submitted by Defendant, around that time it was forced to terminate the employment of two other Associate Trainers; one was fired on April 27, 2011 for job abandonment and the other on April 30, 2011 for misconduct. (Dkt. No. 19, Exh. B at ¶ 8; Exhs. D, E). Miller admits that the terminations occurred while the Associate Trainers were on temporary assignment in Florida, but attests to his understanding that "both employees were set to return to the Pharr facility at the end of April 2011 or beginning of May 2011 and were going to be assigned [to a] training class in Pharr." (Dkt. No. 26, Exh. 1 at ¶ 4). Miller claims that "the Pharr facility's staffing and workload of trainers [were] still impacted by these employee[s'] separations because they were expected to train classes," and therefore "other employees were needed to cover these classes." *Id.*

Rather than assign Plaintiff to a "full-time" class, Garcia assigned him to assist with "Instructor Lead Training" ("ILT"), an hour and forty-five minute class. (Dkt. No. 19, Exh. A at p. 47; *see also* Dkt. No. 23, Exh. 1 at ¶ 11). During the week that Plaintiff helped with ILT, he spent the remaining hours of his shift helping trainees on their phone calls in the "nesting" department, assisting other trainers, and teaching himself Rover. (Dkt. No. 19, Exh. A at pp. 47-

48).  Garcia then assigned Plaintiff to work in nesting for one week, after which time he would be required to take over a full-time class.  *Id.* at pp. 48, 63.  Plaintiff's affidavit claims that his assignment to nesting did not allow for any time to teach himself Rover, and he testified that Garcia refused his request to continue helping with ILT so he could have that additional time to "self-teach." (Dkt. No. 19, Exh. A at pp. 93-94; Dkt. No. 23, Exh. 1 at ¶ 14).  Plaintiff worked in nesting for about two days before deciding that he needed to take more time off from work. (Dkt. No. 19, Exh. A at pp. 48-49).

**2.      Schedule Changes**

Plaintiff claims that Garcia failed to abide by her promise to give him two days' notice before a schedule change when she switched him from the evening shift (two days of Rover training) to the morning shift (ILT class) to the midday shift (nesting).  *Id.* at pp. 51-55.  Plaintiff testified that when he reminded Garcia that he needed two days' notice to adjust his medication, she responded that she would "try to remember." *Id.* at p. 55.  Miller's declaration attests that he was "aware that [Plaintiff] worked on different shifts after his return from leave, but this was simply due to his work assignments." (Dkt. No. 19, Exh. B at ¶ 10).  He further states that "due to the varying job duties trainers perform, they may be required to work on different shifts." *Id.*

**3.      Communications with Miller about Brodniak's Comments and Requested Accommodations**

Shortly after he returned to work on April 21, 2011, Plaintiff sent emails to Miller emphasizing the negative effect of Brodniak's comments on him.  (Dkt. No. 28, Exh. 1 at 000663-64).  Plaintiff asked that Miller follow-up on Plaintiff's previous "incident report" by talking with "all involved." *Id.*

Plaintiff also testified that both before and after he returned to work, he had conversations with Miller about his diagnosis and the accommodations he needed to return to work.  (Dkt. No.

19, Exh. A at pp. 59-60, 63).  Plaintiff testified that Miller "would state that he would look into it and talk to [Garcia] about it," but that Plaintiff felt that Miller did not help him.  *See id.* at pp. 59, 63.  Plaintiff also testified that he gave Miller a doctor's note dated May 5, 2011 indicating that he needed a gradual transition to his job duties.  *Id.* at pp. 71-72.

### d.      No Discriminatory Comments

Plaintiff admitted that when he returned to work after his first leave of absence, no employee of Defendant made any negative or inappropriate comments or jokes to him about his leave or diagnosis.  *Id.* at pp. 56-57.

### E.      Plaintiff's Second Leave of Absence and Termination

### 1.      Email to Defendant's Corporate Representatives

On May 10, 2011, some days after he declined to finish his one-week nesting assignment and left work, Plaintiff sent an email to Defendant's corporate representatives stating that he was "looking for closure to an incident that has plagued me for almost a year," *i.e.*, Brodniak's comments to him.  (Dkt. No. 28, Exh. 1 at 000662).  Plaintiff stated his belief that Garcia and Miller had failed to resolve the incident.  *Id.*  He also expressed his frustration with Garcia for not giving him the requested six weeks of "acclimation" time, and his belief that "there were sufficient trainers available" and that Garcia was "upset and seeking retribution" against Plaintiff for going to Miller about Brodniak's comments.  *Id.*  Plaintiff believed that Garcia "wanted the matter dropped and because I refused she is trying to get me to…quit and give up or continue my sick leave…so she can fire me."  *Id.*  Plaintiff also stated that he had "talked to Mr. Miller repeatedly trying to clear the air and make him understand what I was looking for from the HR department" with regard to Brodniak's comments, and that Miller had told him to "get over it and drop it."  *Id.*  Plaintiff concluded by expressing his "hope that [this email] will not find blind

eyes" and his intent to continue his career with Defendant.  *Id.*

**2.      Defendant's Response**

The email was forwarded to Lilly who works in Brownsville, Texas and oversees the Pharr facility.  (Dkt. No. 19, Exh. C at ¶ 4).  Lilly's declaration states that she "personally checked into [Plaintiff's] allegation that a prior training facilitator had called him 'scatter-brained,'" and that she was unable to conclude that the complaint had merit because "the facilitator could not recall making such comment and the notes from the class did not indicate that such comment was made."  *Id.* at ¶ 5.  Regardless, Lilly "advised the facilitator that in the future she should provide positive criticism."  *Id.*  Lilly also states her "understanding that [Garcia] had previously resolved this issue in December 2010."  *Id.*

Lilly attests, and Plaintiff also testified, that she had a telephone conversation with Plaintiff following her receipt of the email.  (Dkt. No. 19, Exh. A at pp. 65-66; Exh. C at ¶ 7).  Lilly informed Plaintiff that Defendant "wanted to help him, and that if he wished to take additional leave, he would need to submit a request for leave and turn in the appropriate medical documentation."  (Dkt. No. 19, Exh. C at ¶ 4).  Miller also attests that in May 2011, he told Plaintiff that he "needed to complete his medical paperwork to receive the requested leave." (Dkt. No. 19, Exh. B at ¶ 11).

**3.      Denial of Plaintiff's Request for Leave and Termination for "Job Abandonment"**

Defendant's records reflect that Plaintiff requested leave on May 13, 2011 due to "my own medical condition," and that he asked for a leave period of May 5 through June 5, 2011. (Dkt. No. 19, Exh. F).  In a letter to Plaintiff dated May 13, 2011, Defendant notified Plaintiff that it had begun the process of confirming his eligibility for "Personal Medical Leave of Absence (Non-FMLA)," that "[s]upporting documentation for this leave type is required before

the leave can be approved," and that Plaintiff was required to mail all documentation to "Convergys HR Direct" "within 15 calendar days or your leave request may be denied."  (Dkt. No. 19, Exh. G).  Attached to the letter was a form entitled "Convergys Personal Medical Leave (Non FMLA)" to be filled out by Plaintiff's doctor.  *Id.*

Defendant's evidence reflects that Plaintiff's request for leave was denied on June 16, 2011 after he failed to submit the required "medical certification."  (Dkt. No. 19, Exh. C at ¶ 9; Exh. F).  Lilly and Miller attest that as of that date, their understanding was that Plaintiff had not communicated with any supervisor or "management" in over a month.  (Dkt. No. 19, Exh. B at ¶ 12; Exh. C at ¶ 9; Exh. F).  They also state that Defendant's Pharr facility "maintains and enforces a no-call/no-show policy, wherein if an employee fails to call in or show up to work for three (3) days, the employee is considered to have abandoned their job."  (Dkt. No. 19, Exh. B at ¶ 5; Exh. C at ¶ 3).  Pursuant to this policy, on June 17, 2011, Lilly approved the termination of Plaintiff for "job abandonment."  (Dkt. No. 19, C at ¶ 9; Exh. H).

Plaintiff admitted in his deposition that Lilly and Miller advised him that he needed to turn in the medical certification to obtain the requested leave, that he received the certification and gave it to his doctor, and that he did not submit it until July 6, 2011, almost three weeks after his termination.  (Dkt. No. 19, Exh. A at pp. 67-69, 77, 79-80, 82-83).

## IV.    Defendant's Motion for Summary Judgment

## A.    Failure to Exhaust

Defendant's Motion first points to Plaintiff's admission that his charge of discrimination, filed with the requisite administrative agency, alleges discrimination occurring between April 25, 2011 and June 17, 2011.  (Dkt. No. 19; Dkt. No. 19, Exh. A at p. 85).  Defendant therefore moves for summary judgment on any claim of discriminatory conduct occurring before April 25,

2011 on the basis that Plaintiff has failed to exhaust his administrative remedies with respect to such claim.  (Dkt. No. 19); *see*, *e.g.*, *Harris v. Honda*, 213 Fed.Appx. 258, 261 (5th Cir. Dec. 12, 2006) (courts are only to consider TCHRA claims after plaintiff has exhausted administrative remedies by filing charge with Texas Commission on Human Rights or Equal Employment Opportunity Commission).  Plaintiff has not responded to this argument, which is well-taken but mostly inconsequential: with the isolated exception of Brodniak's comments to Plaintiff in late 2010, Plaintiff does not challenge any conduct by Defendant occurring before his return to work in April 2011 as discriminatory or retaliatory on account of his disability.  *See* (Dkt. No. 23).  For the reasons discussed *infra*, even if considered, Brodniak's comments do not raise a genuine issue of material fact on whether any such discrimination or retaliation occurred.

**B.       Disability Discrimination**

Defendant's Motion submits that Plaintiff cannot establish a *prima facie* case of disability discrimination because he has no evidence that Defendant terminated his employment due to his disability, and moreover he cannot overcome the legitimate, nondiscriminatory reason for his termination: job abandonment.  (Dkt. No. 19).  The TCHRA provides that an employer may not discharge or otherwise discriminate against an employee because of his disability.  TEX. LAB. CODE § 21.051.  Under the well-established framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must first establish a *prima facie* case of discrimination by showing that he (1) is a member of a protected class; (2) was discharged; (3) was qualified for the position from which he was discharged; and (4) was replaced by someone outside the protected class, treated less favorably than similarly situated members outside the class, or otherwise discharged because of his protected characteristic. *E.g.*, *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005) (applying *McDonnell Douglas* framework to TCHRA

claim at summary judgment stage); *Yselta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (citing *Reeves*, 530 U.S. at 142).[5]  The burden then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the discharge. *Machinchick*, 398 F.3d at 356. The burden on the employer at this stage is "one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). If the defendant comes forward with a nondiscriminatory reason, the plaintiff must then show (1) that the reason was pretext for discrimination or, (2) even if the reason is true, that another motivating factor was the protected characteristic. *Machinchick*, 398 F.3d at 356; TEX. LABOR CODE § 21.125(a) (unlawful employment practice established when complainant demonstrates that protected characteristic was "a motivating factor" for employment practice, even if other factors also motivated practice).

Plaintiff testified that in December 2010, during his approximately five-month leave of absence from work, he was diagnosed with major depression.  Defendant does not dispute that major depression constitutes a disability under the TCHRA or that Plaintiff was qualified for the Associate Trainer position he held at the time of his termination.  *See* (Dkt. No. 19).  Rather, Defendant claims that no evidence exists that it terminated Plaintiff's employment on June 17, 2011 because of his major depression or for any reason other than the legitimate, nondiscriminatory reason of job abandonment.  *Id.*  As Defendant points out, Plaintiff concedes that he did not timely submit the medical certification required to support his request for a leave period of May 5 through June 5, 2011.  Plaintiff attempts, through his affidavit filed after his deposition, to claim that he "was given a medical certification with no time line for return," that

---

[5]  As the TCHRA carries out the policies embodied in Title VII of the Civil Rights Act of 1964 as well as the Americans with Disabilities Act ("ADA"), Title VII and ADA cases are instructive in interpreting disability claims under the TCHRA.  *See Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 475 n.2, 476 (Tex. 2001).

he believed that Defendant's Human Resources ("HR") Department would complete the process for him, and that he was not informed that his doctor had not submitted the certification.  (Dkt. No. 23, Exh. 1 at ¶¶ 8, 17-19).  However, Plaintiff previously testified that Lilly and Miller told him that he needed to submit the certification to support his request for leave.  He also has not disputed that he received the letter dated May 13, 2011 enclosing the certification and informing him that he had to mail all supporting documentation to HR within 15 days or risk denial of his leave request; in fact, he testified that he received the certification and gave it to his doctor.  Therefore, Plaintiff's statements indicating that he did not know of the requirement that he timely submit the certification, or that he thought that the responsibility lay with HR alone, are contradicted by his prior testimony and need not be considered.

Even if Plaintiff subjectively believed that he had only to give the certification to his doctor and allow his doctor and HR to complete the process, this does not change the fact that HR did not receive the certification within the requisite period of time, resulting in the denial of Plaintiff's request for leave on June 16, 2011.  Plaintiff does not dispute that as of that date, he had been absent from work for almost two weeks past the requested end date for his leave, which was June 5, and that he had not communicated with his supervisors or management in over a month.[6]  The denial of leave, absence from work, and lack of communication triggered the enforcement of Defendant's undisputed no-call/no-show policy, and together constitute a legitimate and nondiscriminatory reason for Plaintiff's termination.  *See Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998) (plaintiff's absence without official leave for ten days

---

[6]  Plaintiff's affidavit claims that Lilly assured him that Defendant "wanted to give all the time I needed to get better and not to worry about talking to [Miller or Garcia]," but elsewhere in his affidavit (and in his deposition) he states that Lilly told him to take leave for one month.  (Dkt. No. 23, Exh. 1 at ¶¶ 17, 19; *see also* Dkt. No. 19, Exh. A at p. 77).  Given that Plaintiff formally requested a one-month period of leave, the Court need not give credence to any claim that Lilly led him to believe that he could take more time off without communicating with his supervisors.

was legitimate, nondiscriminatory reason for his termination); *Comeaux-Bisor v. YMCA of Greater Houston*, 290 Fed.Appx. 722, 726 (5th Cir. Aug. 22, 2008) (plaintiff's failure to return to work after requested leave period had ended was legitimate, nondiscriminatory reason for her termination); *Cortez v. Raytheon Co.*, 663 F.Supp.2d 514, 522 (N.D.Tex. 2009) (where plaintiff's leave of absence had ended and her physician had not provided documentation to employer which would justify further medical leave, employer had legitimate, nondiscriminatory reason for her termination).   In an apparent attempt to show that his disability of major depression was a motivating factor for his termination, Plaintiff's response points to his supervisors' alleged failure to allow for the gradual transition to work that he needed due to his disability.  (Dkt. No. 23).  For the reasons explained *infra*, Plaintiff has not raised a genuine issue of material fact on whether Defendant failed to reasonably accommodate his disability, and therefore any such alleged failure cannot form the basis for Plaintiff's discrimination claim. Further, once Plaintiff attempted to take leave for a second time but failed to submit the required medical certification, and remained absent from work past the requested leave period and without communicating with his supervisors, he foreclosed any reasonable claim that his supervisors' past failure to accommodate his disability at work somehow motivated his termination for abandoning his job.   Plaintiff's response also attempts to use Brodniak's comment that Plaintiff appeared "scatterbrained" during his presentation as an example of "insensitivity to Plaintiff's condition" that motivated his termination.  *Id.*  However, Brodniak made the alleged comment before Plaintiff was diagnosed with major depression and given approximately five months of leave, and she had no role in the decision to terminate him.  *Cf. Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) (to constitute evidence of discrimination, oral statement must (1) demonstrate discriminatory animus and (2) be made by person primarily

responsible for adverse employment action or by person with influence or leverage over formal decisionmaker).   Moreover, Plaintiff admitted that after he returned from his first leave of absence, no employee of Defendant made any negative remarks about his diagnosis.  The record does not raise a genuine issue of material fact with regard to whether Defendant terminated Plaintiff on the basis of his disability.  Therefore, the Court must grant summary judgment on this claim.

## C.      Retaliation

Defendant also challenges Plaintiff's ability to establish a *prima facie* case of retaliation, claiming that the record lacks evidence that Plaintiff engaged in any activity protected under the TCHRA.   (Dkt. No. 19).   In the alternative, Defendant submits that it had a legitimate, nondiscriminatory reason for Plaintiff's termination.   *Id.*   To make a *prima facie* case of retaliation under the TCHRA, a plaintiff must show that (1) he engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action.  *E.g.*, *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  A plaintiff engages in protected activity if, under the TCHRA, he (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing. TEX. LAB. CODE § 21.055.  If the plaintiff establishes his *prima facie* case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory purpose for the adverse action. *Pineda*, 360 F.3d at 487.  As § 21.125(a) and its "motivating factor" language do not apply to claims for retaliation under § 21.055, the plaintiff must then establish pretext by showing that without his protected activity, the defendant's prohibited conduct would not have occurred.  *Id.* at 487-89.

Plaintiff's response claims that the protected activity in this case consists of his complaints to "management" that he was not receiving the promised accommodations. (Dkt. No. 23). Although case law permits a request for a reasonable accommodation to constitute protected activity, *see Tabatchnik v. Cont'l Airlines*, 262 Fed. App'x 674, 676 (5th Cir. Jan. 30, 2008), for the reasons explained *supra*, Defendant terminated Plaintiff for the legitimate, nondiscriminatory reason of job abandonment. The evidence does not permit the reasonable inference that, but for Plaintiff's accommodation requests and related complaints, he would not have been terminated for failing to submit the required medical certification, failing to come to work for approximately two weeks after his second requested leave period had ended, and failing to communicate with management for over a month. Therefore, the Court must enter summary judgment on Plaintiff's retaliation claim.[7]

**D.      Failure to Accommodate**

Defendant moves for summary judgment on Plaintiff's final claim that Defendant failed to reasonably accommodate his disability, arguing that no evidence exists of any such failure. (Dkt. No. 19). The TCHRA provides that it is unlawful for an employer "to fail or refuse to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability…unless [the employer] demonstrates that the accommodation would impose an undue hardship on the operation of the business…." TEX. LAB. CODE § 21.128. Thus, to establish a claim for failure to accommodate, a plaintiff must show that (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *Cortez*, 663 F.Supp.2d at 524. Again, Defendant does not dispute that Plaintiff had a disability or that he was

---

[7]   Plaintiff does not argue that his complaints regarding Brodniak's comments constituted protected activity, and even if he had, the record would not place the pretext element in genuine dispute. *See* (Dkt. No. 23).

a "qualified" employee—that is, that his disability of major depression did not affect his ability to "reasonably perform" the job of Associate Trainer. *See* (Dkt. No. 19); TEX. LAB. CODE § 21.105; *see also* 42 U.S.C. § 12111(8) (defining qualified individual under ADA as one who, with or without reasonable accommodations, can perform essential functions of his position). Defendant also does not dispute, and the record establishes, that Plaintiff made Defendant aware of his disability. *See* (Dkt. No. 19). The third element, which is the only one in dispute, requires that the employer and employee engage in a good faith interactive process to determine a reasonable accommodation. *See Molina v. DSI Renal, Inc.*, 840 F.Supp.2d 984, 1001-02 (W.D.Tex. 2012); *Cortez*, 663 F.Supp.2d at 524. "'[A]n employer's obligation to provide a 'reasonable accommodation,' when triggered, contemplates changes to an employer's procedures, facilities, or performance requirements that will permit a qualified individual with a disability to perform the essential functions of his or her job.'" *Cortez*, 663 F.Supp.2d at 524 (quoting *Burch v. Coca-Cola Co.*, 119 F.3d 305, 314 (5th Cir. 1997)). Reasonable accommodations may include "'job restructuring, part-time or modified work schedules, or reassignment to a vacant position,'" but an employer is not required "'to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employee[s] to do so.'" *Molina*, 840 F.Supp.2d at 1001, 1003 (quoting 42 U.S.C. § 12111(9); *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)). "Importantly, the employee's right is to a 'reasonable accommodation, not to the employee's preferred accommodation.'" *Id.* at 1001 (quoting *EEOC v. Agro Distrib. LLC*, 555 F.3d 462, 471 (5th Cir. 2009)). If an employer's unwillingness to engage in the good faith interactive process leads to a failure to reasonably accommodate the employee, the employer violates the TCHRA, but no violation occurs if responsibility for the breakdown of the

interactive process is traceable to the employee and not the employer.  *Molina*, 840 F.Supp.2d at 1001; *Cortez*, 663 F.Supp.2d at 524.

The evidence establishes that that Defendant, through Garcia and Miller, engaged in the interactive process with Plaintiff by discussing accommodations for his disability of major depression.  The Court's review of the record identifies three specific accommodations requested by Plaintiff both before and after his return from his first leave of absence: (1) six weeks of "acclimation" training, primarily to allow him to become familiarized with the new Rover system; (2) two days' notice before a shift change so that he could adjust his medication accordingly; and (3) continued assignment to ILT, an hour and forty-five minute class, rather than nesting and/or training a "full-time" class.  The Court first notes, as Defendant's Motion points out, that Plaintiff returned to work on April 21, 2011 with a doctor's note indicating that he had no restrictions.  (Dkt. No. 19).  Although Plaintiff claims that the doctor made such indication with the understanding that Plaintiff would receive six weeks of training upon his return, no evidence exists that Defendant had any awareness of the doctor's alleged intent.  At least until Miller received the doctor's note dated May 5, 2011 which stated that Plaintiff needed a gradual transition to his job duties, Defendant only had knowledge that Plaintiff had been diagnosed with major depression and subjectively wanted the requested accommodations to ease his transition back to work.  It is against this backdrop that the Court must determine whether the record raises a genuine issue of material fact on Plaintiff's claim for failure to accommodate.

The record reflects that the six weeks of training desired by Plaintiff consisted of the two, three-week classes normally given to new employees and facilitated by PRTs and Associate Trainers.  Although Plaintiff claims that Garcia promised him this "acclimation" training which was provided to other employees upon their return from leave, he could identify no other

employee who had received it under these circumstances.  Miller and Lilly state that they know of no other such employee, and therefore the Court finds that Plaintiff's own subjective belief does not raise a genuine issue on this point.  It is undisputed that Plaintiff did not receive six weeks of training; rather, he received two days of Rover training followed by an assignment to ILT for one week, during which he taught himself Rover, and an assignment to nesting for one week, which apparently did not allow for time to self-teach, after which he would be required to resume teaching a "full-time" class.  Plaintiff completed about two days of his nesting assignment before deciding that he needed to take more time off from work.

Again, considering that Plaintiff returned to work on April 21, 2011 with a doctor's note stating that he had no medical restrictions, the record does not raise a genuine issue of material fact on whether the "acclimation" provided to Plaintiff by Defendant failed to reasonably accommodate his disability of major depression.  The Court recognizes that Plaintiff received only two days of Rover training (presumably, April 21 and 22) before Garcia told him that he would need to take over a full-time class, and that Garcia's "business needs" explanation for this change does not coincide with Miller's explanation—that is, that the loss of two other Associate Trainers at the *end* of April affected the Pharr facility trainer schedule.  However, even assuming that Garcia intended to make this change to Plaintiff's schedule for another reason, permissible or not, Garcia ultimately gave Plaintiff another option, which he accepted, of helping with the shorter, ILT class.  During his week-long assignment to ILT, Plaintiff used extra time during his shift to teach himself Rover.  By the time Plaintiff had completed two days of his next assignment to nesting (around May 3), the terminations of the two other Associate Trainers had occurred.  Although Garcia did not allow Plaintiff to continue helping with ILT, again, at that time she had no doctor's indication that Plaintiff had any medical restrictions for returning to

work.  It was not until Plaintiff had left work for a second time that he gave Miller the May 5, 2011 doctor's note indicating that he needed a gradual transition to his job duties.  Defendant, through Miller and Lilly, informed Plaintiff that he could request additional leave with the appropriate supporting medical documentation, and Plaintiff in fact requested a leave period beginning on May 5.  To the extent that Plaintiff's request for a second, one-month medical leave of absence constituted an additional request for accommodation, Plaintiff effectively received it: he did not report to work but remained employed during the one-month period.  Moreover, the fact that Plaintiff's leave request was later denied was traceable to Plaintiff's failure to submit the medical certification, absence from work past the requested leave period, and failure to communicate with management, and therefore cannot support a claim against Defendant for failure to accommodate.  The Court also discerns no failure to accommodate in Plaintiff's shift changes during his return to work: the first change was attributable to Plaintiff's acceptance of the offer to help with ILT rather than resume teaching a full-time class, and the record reflects that the second shift change was separated by a weekend.

The Court notes, as its discussion of the evidence reflects, that Plaintiff's frustration upon his return to work also appears to have been tied to his perception that Defendant, through Garcia and Miller, did not support his requests for resolution of his "incident report" concerning Brodniak's comments.  A prompt, transparent handling of the incident report may have precluded or at least lessened this dispute over Plaintiff's termination, but any failure on the part of Defendant to provide this type of resolution does not evince discrimination, retaliation, or failure to accommodate on the basis of Plaintiff's disability.  The record contains no evidence to raise a genuine issue of material fact on whether any asserted violation of the TCHRA occurred, and therefore the Court must enter summary judgment on all of Plaintiff's claims.

**V.       Conclusion**

For the foregoing reasons, the Court hereby **ORDERS** that Defendant's Motion to Strike (Dkt. No. 25) is **GRANTED IN PART** with respect to those relevant statements in Plaintiff's affidavit that either contradict his prior deposition testimony or are not based on his personal knowledge.

The Court further **ORDERS** that Defendant's Motion for Summary Judgment (Dkt. No. 19) is **GRANTED**.

SO ORDERED this 14th day of November, 2013, at McAllen, Texas.

Randy Crane
United States District Judge